**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

| | | |
|---|---|---|
| **FEDERAL NATIONAL MORTGAGE ASSOCIATION,** | ) ) ) | |
| **Appellant,** | ) ) | |
| **v.** | ) ) | **No. 13-2643-STA** |
| **VILLAGE GREEN I, GP,** a Nevada General Partnership, | ) ) ) | |
| **Defendant.** | ) ) | |

---

**OPINION**

---

Appellant Federal National Mortgage Association ("Fannie Mae") appeals the decision of the United States Bankruptcy Court for the Western District of Tennessee, confirming the Fifth Amended Plan of Reorganization and Supplemental Amendment ("the plan") proposed by Appellee Village Green I, GP ("Village Green"), the Debtor in the bankruptcy proceeding. For the reasons set forth below, the decision of the Bankruptcy Court is **AFFIRMED IN PART** and **REVERSED AND REMANDED**.

**BACKGROUND**

This is Fannie Mae's second appeal in this matter. The Court set out the factual and procedural background of the case as well as the relevant plan terms in its opinion in *Federal National Mortgage Association v. Village Green I, GP*, 483 B.R. 807 (W.D. Tenn. 2012) ("*Village Green I*"). As such, the Court need not review the full background of Village Green's bankruptcy

1

proceedings and the plan confirmed by the Bankruptcy Court here.  Briefly, Village Green is the owner of the Village Green Apartments located at 3450 Fescue Lane, Memphis, Tennessee ("the property").  The property is a 314-unit apartment complex situated in the Hickory Hill neighborhood of Memphis, Tennessee.  On April 16, 2010, Village Green filed its Chapter 11 petition.  In *Village Green I*, the Court largely affirmed the Bankruptcy Court's initial order confirming the plan.  The Court remanded the case for the limited consideration of the following issues: (1) whether artificial impairment is relevant to its analysis under § 1129(a)(10) or the analysis under § 1129(a)(3); (2) whether Village Green had shown good cause to for the impairment of the claims of its accountant and attorney; and (3) whether the plan's proposed modification of the loan documents was fair and equitable to Fannie Mae.

On July 19, 2013, the Bankruptcy Court issued its Supplemental Findings of Fact and Conclusions of Law.  With respect to the artificial impairment issue, the Bankruptcy Court held that "any artificial impairment would not run afoul of § 1129(a)(10), but instead should be examined in conjunction with whether the plan is proposed in good faith as required by § 1129(a)(3)."  The Bankruptcy Court went on to find that Village Green had satisfied the good faith requirement of § 1129(a)(3) by showing economic justification for delaying payment to its accountant and attorney, payments Fannie Mae has dubbed the "*de minimis* claims."  The Bankruptcy Court reasoned that throughout the proceedings Fannie Mae had refused to release escrowed reserve funds to Village Green and that without the funds, Village Green needed to "ration every dollar."  Thus, under the circumstances, Village Green had legitimate grounds for not cashing out the two unsecured claims of its account and attorney.  Finally, the Bankruptcy Court concluded that the plan was fair and equitable pursuant to § 1129(b)(1).  The plan revised certain terms in the Deed of Trust, giving

Village Green more control over escrowed taxes and insurance premiums as opposed to Fannie Mae holding the funds. The Bankruptcy Court concluded that these changes did not unfairly shift the risk of reorganization to Fannie Mae. Therefore, the Bankruptcy Court confirmed the plan, holding that the plan satisfied the requirements of 11 U.S.C. § 1129. Fannie Mae's timely appeal followed.

Fannie Mae raises two issues on appeal. Fannie Mae first argues that the Bankruptcy Court erroneously found that Village Green proposed its plan in good faith under 11 U.S.C. § 1129(a)(3). The Bankruptcy Court determined on remand that Village Green had shown economic justification for delaying payments to its accountant and attorney, in part because Village Green did not know whether it would have access post-confirmation to the replacement reserve funds held by Fannie Mae. Fannie Mae contends that this finding was clearly erroneous and inconsistent with the Bankruptcy Court's previous orders. The Bankruptcy Court awarded Village Green the funds at the same time that it confirmed the plan. In fact, the Bankruptcy Court found that Village Green's plan was feasible largely because Village Green would have control of the reserve funds. The Bankruptcy Court's finding on remand then that Village Green had no assurance it would have the reserve funds fails to account for the Bankruptcy Court's earlier order that Village Green was entitled to the funds.

Fannie Mae adds that even if some uncertainty existed about the fate of the reserve funds, Fannie Mae tendered the $2,400 owed to Village Green's accountant and attorney, simply to satisfy the claims and remove them from the plan. When these creditors refused Fannie Mae's tender, Fannie Mae filed a motion with the Bankruptcy Court to remove the claims from Village Green's schedule of liabilities. The Bankruptcy Court denied the motion.[1]  Moreover, Village Green simply

---

[1] Fannie Mae does not seek review of the Bankruptcy Court's order denying its motion to remove the claims. Therefore, the Court does not consider that ruling here.

had no justification for impairing claims totaling only $2,400.  Based on its own feasibility analysis, Village Green projected gross effective income of $2,012,449.67 and net operating income of $865,696.75 in 2011.  According to Fannie Mae then, there was no economic justification for impairing the "*de minimis* claims," and the Court should reverse the Bankruptcy Court's supplemental order.

In its second assignment of error, Fannie Mae contends that the Bankruptcy Court erroneously held that the plan modifications to certain loan covenants were "fair and equitable" to Fannie Mae as required by § 1129(b)(1).  As an initial matter, Fannie Mae objects that the Bankruptcy Court's analysis of this issue was too cursory and improperly focused on the fairness of the plan to Village Green, not Fannie Mae.  As for its substantive objections, Fannie Mae asserts that Village Green is no longer required to maintain the property "in good repair" and that Fannie Mae has no recourse or right to demand repairs.  The plan further eliminates Fannie Mae's control over escrow funds and Fannie Mae's right to approve the property manager and the property management contract.  Instead the plan gives Village Green full discretion over the appointment of a property manager and permits Village Green to escrow funds for insurance, taxes, and reserves "independently."  Village Green also has absolute authority to approve the operating budget and plan for capital expenditures and repairs to the property.  Fannie Mae cautions that such discretion poses a risk of self-dealing and abuse that could result in harm to the value of the property and leaves Fannie Mae with no reasonable assurance that Village Green will adequately maintain the property.  Nor does the new management agreement require Village Green to maintain books and records for inspection by Fannie Mae.  Fannie Mae argues that both parties' experts testified before the Bankruptcy Court that these modifications shift risk to Fannie Mae.  In short, Fannie Mae contends

4

that "[t]he plan and the New Management Agreement remove so many of the protections provided by the Loan Documents and the original Fannie Mae-approved 2008 Management Agreement that Fannie Mae's interest in the Property could be severely harmed during the ten-year term of the plan." Appellant's Br. 33.  For these reasons, Fannie Mae claims that the plan is not fair and equitable under § 1129(b)(1).

## STANDARD OF REVIEW

The Court applies the clearly erroneous standard of review to the Bankruptcy Court's factual findings and reviews its conclusions of law *de novo*.[2]  "Clear error occurs only when [the Court is] left with the definite and firm conviction that a mistake has been committed.  If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[3] If the Bankruptcy Court's conclusion raises a mixed question of law and fact, the district court "must break the question into its constituent parts and apply the appropriate standard of review for each."[4]  Having set out the proper standard of review, the Court now turns to analyze the issues raised in this appeal.

## ANALYSIS

### I. Good Faith

The first issue presented is whether Village Green proposed its plan, impairing the two

---

[2] *Class Five Nev. Claimants v. Dow Corning Corp., (In re Dow Corning Corp.)*, 280 F.3d 648, 656 (6th Cir. 2002).

[3] *Mitan v. Duval (In re Mitan)*, 573 F.3d 237, 241 (6th Cir. 2009) (quotation omitted); Fed. R. Bankr. P. 8013.

[4] *Bank of Montreal v. Official Comm. of Unsecured Creditor* (*In re Am. HomePatient, Inc.*), 420 F.3d 559, 563 (6th Cir. 2005) (quotation omitted).

unsecured claims of its accountant and attorney, in good faith as required by 11 U.S.C. § 1129(a)(3). Under that paragraph, a court may confirm a plan only if "the plan has been proposed in good faith and not by any means forbidden by law."[5]  Courts have held that in the context of Chapter 11, "good faith" means that the plan will likely achieve a result consistent with the objectives and purposes of the Code.[5]  "In assessing whether a plan complies with § 1129(a)(3)'s good faith standard, a bankruptcy court must examine the totality of the circumstances."[6]  "The bankruptcy judge is in the best position to assess the good faith of the parties."[7]  The good faith determination "is essentially a factual inquiry and will only be reversed if clearly erroneous."[8]

As this Court held in the first appeal, in order to satisfy the good faith requirement, "Village Green must demonstrate some economic justification for delaying payment to the *de minimis* creditors," which would in turn show "that the claims are actually, as opposed to artificially, impaired."[9]  On remand the Bankruptcy Court held that Village Green had economic justification

---

[5] 11 U.S.C. § 1129(a)(3).

[5] *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 468 (Bankr. S.D. Ohio 2011) (citing *In re Madison Hotel Assocs.*, 749 F.2d 410, 425) (7th Cir. 1984)) (other citations omitted).

[6] *Id.* (citing *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074) (9th Cir. 2002)); *see also Metro Emps. Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah)*, 836 F.2d 1030, 1033–34 (6th Cir. 1988) (holding that a debtor's good faith under chapter 13 is assessed under the "totality of the circumstances").

[7] *In re Carolina Tobacco Co.*, 360 B.R. 702, 718 (D. Or. 2007).

[8] *Tenn-Fla Partners v. First Union Nat. Bank of Fla.*, 229 B.R. 720, 734 (W.D. Tenn. 1999) (citing *Soc'y Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 591 (6th Cir. 1992)); *see also In re Paige*, 685 F.3d 1160, 1178 (10th Cir. 2012) (citing *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 969 (7th Cir. 1997), rev'd on other grounds by *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999)).

[9] *Village Green I*, 483 B.R. at 817–18.

for impairing the *de minimis* claims of its accountant and attorney and concluded that Village Green had proposed the plan in good faith. The Bankruptcy Court found that Village Green had to "ration every dollar," largely because Village Green could not have known how the Bankruptcy Court would ultimately decide to disburse replacement reserve funds. The Bankruptcy Court further found that Village Green had no assurance that Fannie Mae would honor any requests for reimbursement from the replacement reserves. In fact, the Bankruptcy Court found that due to the acrimony between the parties, Village Green reasonably assumed that Fannie Mae would not release the funds.

The Court holds that the Bankruptcy Court's determination of the good faith issue was clearly erroneous. Under the terms of the plan confirmed by the Bankruptcy Court, Village Green was to pay $1,200 of these claims 30 days after confirmation with the remaining $1,200 due 60 days after confirmation. The great weight of the evidence showed that Village Green had no economic justification for failing to pay out $2,400 in claims to its accountant and attorney. Fannie Mae argues that Village Green's budget projections for 2011 showed gross effective income of $2,012,449.67 and net operating income of $856,696.75. The Court would add that Village Green's budget estimated total net income of $63,196.75 for 2011. Taken at face value, this evidence certainly calls into doubt the Bankruptcy Court's finding that Village Green was economically justified in not paying $2,400 in debts owed to its accountant and attorney.

Even so, Village Green's projected budget does not tell the full story. At the confirmation hearing, Village Green's representative Eric Clausen testified that as of September 30, 2011, Village Green had lowered its projection and expected net operating income of $565,912.37 for 2011, a shortfall of over $290,000. Village Green attributed the shortfall to delays in confirmation and to Fannie Mae's decision to withhold approximately $74,150.69 in replacement reserve funds during

the pendency of the bankruptcy.[10]  With respect to the delays, Village Green argued and the Bankruptcy Court found that the duration of the confirmation process itself had in fact contributed to Village Green's lower than expected net operating income for 2011.  Prior to confirmation Village Green was making monthly principal and interest payments of $55,040.41 to Fannie Mae; however, upon confirmation, the plan called for Village Green to make initial principal and interest payments of $30,322.66 per month, a difference of $24,717.75.[11]  As such, the Bankruptcy Court determined that had confirmation occurred six months earlier, Village Green would have realized $148,000 in additional cash on hand, which would presumably translate to increased net operating income.[12]  This evidence certainly accounts for part of the shortfall in Village Green's projected net operating income for 2011.  But this aspect of the plan also calls into doubt the Bankruptcy Court's finding that Village Green had need to "ration every dollar" in order to make its plan work.  Village Green anticipated an extra $24,717.75 in available cash every month following confirmation, ten times the amount of the debts owed to its accountant and attorney.  From this evidence it is difficult to discern an economic necessity to justify Village Green's plan to delay payment of the $2,400 in claims owed to its *de minimis* creditors.  On the contrary, it is clear that Village Green had (or reasonably expected to have) ample cash on hand to pay the claims.

Even though confirmation did not occur as quickly as Village Green had wished, the fact remains that its net operating income for 2011 was in excess of $565,000.  The evidence also shows that Village Green's budget allowed it significant "flexibility" in meeting other obligations.  In

---

[10] Village Green's Post-Trial Br. in Support of Confirmation, AER 769.

[11] Mem. Op. on Confirmation, Jan. 20, 2012, AER 160.

[12] *Id.*

briefing the feasibility of its plan, Village Green highlighted that under the plan capital expenditures and project improvements totaling $403,000 in each of years one, two, and three of the plan were "not necessarily required to be spent in those years, and flexibility exists in the amount and timing of these expenditures."[13]  Clausen testified at the confirmation hearing that the improvements were "upgrades" to "increase the rentability of the Property" and therefore amounted to "discretionary" expenditures.[14]  By its own admission then, Village Green recognized that even as it faced lower than projected net operating income in 2011, it retained "flexibility" over $403,000 in expenditures budgeted for that year, which were "not necessarily required."  This "flexibility" further shows that Village Green was not so strapped for cash that it had economic justification to ration as little as $2,400.

Not only did Village Green easily possess the wherewithal to pay the *de minimis* claims prior to confirmation, other record evidence shows that Village Green's position was expected to be even stronger under the terms of the confirmed plan.  As previously discussed, Village Green's plan proposed savings of $24,717.75 per month from lower principal and interest payments to Fannie Mae.  Village Green also reported and the Bankruptcy Court found in its confirmation order that following a "successful property tax appeal," taxes due on the property were actually $20,000 to $30,000 lower than the taxes Village Green had been paying into escrow.[15]  This change in circumstances arguably gave Village Green the right to take possession of the excess funds for its ongoing operational needs, including the $2,400 in claims owed to its accountants and attorneys.

---

[13] AER 772–73.

[14] AER 773.

[15] *Id.* at 770; Mem. Op. on Confirmation, Jan. 20, 2012, AER 157.

Perhaps most importantly, Village Green projected lower than expected interest payments to Fannie Mae. The plan as proposed assumed a total unsecured debt to Fannie Mae of $3,200,000. Village Green indicated at confirmation that its unpaid principal balance as of March 2011 was actually $148,000 less than the total amount of Fannie Mae's secured and unsecured claims on the property. Furthermore, Village Green argued that its post-default and post-petition payments to Fannie Mae were not properly applied. Thus, Village Green requested that the Bankruptcy Court order Fannie Mae to apply its payments as follows: $1,050,537.39 to principal and interest; $137,138.35 to property taxes; $51,077.55 to property insurance; and $74,150.69 to replacement reserves. Taking the $148,000 the plan had overestimated in unpaid principal owed to Fannie Mae together with the $1,050,537.39 Fannie Mae had not properly applied, Village Green asserted that its actual unsecured liability to Fannie Mae was reduced by $1,199,167.74 from the $3,200,000 liability assumed in the plan. As a result, Village Green estimated that it would save almost $65,000 in annual interest paid to Fannie Mae on the unsecured claim. Accepting Village Green's own estimates and calculations then, Village Green's improved circumstances would reasonably result in $381,613 in additional cash in its first year alone, some of which its own plan had not anticipated.[16] These facts cast even more doubt on the Bankruptcy Court's finding that Village Green had economic justification for not paying the $2,400 in claims to its accountants and attorneys.

In assessing Village Green's economic justification for impairing $2,400 in claims, the Bankruptcy Court did not address these other details of Village Green' plan, all of which tend to show that Village Green had the means to pay the claims. The Bankruptcy Court only remarked that

---

[16] This figure, $381,613, is the sum of the reduced principal and interest payments of $296,613 during year one of the plan ($24,717.75 x 12 months); $20,000 in lower property taxes; and $65,000 in interest savings during year one of the plan.

"[i]t is ironic that at the confirmation hearing Fannie Mae argued that Village Green's plan was not feasible" and then went on to find that Fannie Mae's position on feasibility supported the finding that "every dollar was needed at confirmation."  While the feasibility of the plan is not at issue in this appeal, the Bankruptcy Court determined that the plan was feasible due in part to the refund of the replacement reserves and the reduction of Village Green's principal and interest payments.[17]  In other words, the very details of the plan that made it feasible under 11 U.S.C. § 1129(a)(11) were the same features of the plan that should have allowed Village Green to pay off a mere $2,400 in debts.  This Court holds that the Bankruptcy Court's economic justification finding was simply not a permissible view of the evidence under the totality of the circumstances.

Rather than considering whether Village Green had some justification for not paying the claims of its accountants and attorneys in light of all of the terms of the plan, the Bankruptcy Court focused only on the replacement reserve funds.  The Bankruptcy Court stressed that "at the point of the highly contested confirmation hearings," Village Green had no assurance that Fannie Mae would release the replacement reserve funds.[18]  The Bankruptcy Court concluded therefore that this "uncertainty . . . provided the economic justification for not cashing out the claims of the accountant and the attorney."[19]  Village Green also blamed its lower than expected net operating income in 2011 on Fannie Mae's refusal to release replacement reserve funds.  According to Clausen, Fannie Mae's conduct forced Village Green to make property repairs without reimbursement from the reserve funds.  Village Green argued that it lost other income due to the "accrued detrimental impact" on its

---

[17] AER 160.

[18] Suppl. Findings of Fact & Conclusions of Law 4 (D.E. # 1-2).

[19] *Id.*

11

ability to make more apartment units ready for rental.[20]

Fannie Mae contends on appeal that there is no longer any doubt about the disposition of the replacement reserve funds. The Bankruptcy Court's confirmation order resolved the dispute over the funds in favor of Village Green and ordered that Village Green was entitled to reimbursement from the reserves for its repair costs. Be that as it may, it is true that when Village Green proposed its plan in May 2011, it could not have known whether the Bankruptcy Court would in due course award it the replacement reserves. The good faith inquiry focuses on whether the debtor acted in good faith at the time it proposed its plan, not on the totality of the circumstances at the time the Bankruptcy Court confirmed the plan.[21] And yet the fate of the replacement reserves was only one aspect of the plan that might affect Village Green's overall economic circumstances. As such, the dispute over the replacement reserves was only one factor for the Bankruptcy Court to consider in determining whether Village Green had economic justification for not paying out $2,400 in claims.

Indeed, even confining the good faith inquiry to what Village Green initially proposed and what facts were available long before confirmation, the plan as proposed clearly shows that Village Green had no justification for withholding $2,400 from its creditors as part of its Chapter 11 plan. As previously mentioned, when Village Green proposed the plan, it projected a net operating income of $856,696.75 for 2011, the first year of the plan according to Village Green's timetable. To be complete, Village Green's five-year budget also projected total net income of only $7,494.94 in 2012 and $6,009.58 in 2013 followed by total net income of $307,390.14 and $329,978.58 in 2014 and 2015, respectively. The plan as proposed also included a number of the features already discussed

---

[20] *Id.*

[21] § 1129(a)(3) (A bankruptcy court may confirm a plan only if "the plan *has been proposed* in good faith.").

12

here, such as lower initial monthly principal and interest payments, which would save Village Green over $24,000 per month, and certain improvements to the property, which gave Village Green considerable discretion over $403,000 during each of the first three years of the plan. Against this more complete backdrop of the plan as a whole, the Bankruptcy Court's findings that Village Green had to ration every dollar simply because of the uncertainty surrounding the reserve funds lacks support and fails to take into account the other features of Village Green's plan.

Finally, the Court notes that Fannie Mae attempted to pay the $2,400 in claims on its own and have them removed from Village Green's schedules. Fannie Mae argued to the Bankruptcy Court that the Security Agreement between the parties gave Fannie Mae the right to pay the fees of attorneys and accountants on Village Green's behalf in the event Village Green sought bankruptcy protection.[22] According to the record, Fannie Mae tendered checks to Village Green's accounting firm and attorney and had their tender of payment refused. Despite the creditors' refusal to accept payment, Fannie Mae filed a motion with the Bankruptcy Court to amend Village Green's schedules and have the claims of the accountant and attorney removed. The Bankruptcy Court held that without negotiation of the checks, the debts had not been discharged. Therefore, amendment of the schedules was not warranted. Fannie Mae has not appealed the Bankruptcy Court's ruling on this issue but only cited these circumstances in support of its argument that Village Green did not propose the plan impairing the claims of the accountant and attorney in good faith. This Court holds that strictly speaking, the actions and motivations of Village Green's creditors in refusing payments tendered on behalf of Village Green are not entirely relevant to the issue presented in this appeal, namely, whether Village Green proposed the plan in good faith pursuant to 11 U.S.C. § 1129(a)(3).

---

[22] AER 670.

Therefore, the Court declines to address this issue further.

The Bankruptcy Court's determination that Village Green had economic justification for impairing the *de minimis* claims of its accountant and attorney leaves the Court "with the definite and firm conviction that a mistake has been committed."[23]   As the Court noted in its previous opinion, "business debtors going through reorganization need what capital they have for ongoing expenses."[24]   However, the Bankruptcy Court's finding is simply not a permissible view of the evidence under the totality of the circumstances in this case.   Therefore, the Bankruptcy Court's order is **REVERSED** on the good faith issue and **REMANDED**  for further proceedings consistent with this opinion.

## II.  Fair and Equitable

The other issue raised in this appeal is whether the Bankruptcy Court's reformation of the parties' contractual rights was fair and equitable to Fannie Mae under 11 U.S.C. § 1129(b)(2). Having concluded that the plan does not satisfy the good faith requirements of section 1129(a)(3), consideration of the fairness and equity issue is not required to resolve this appeal.   However, the Court finds that it would serve the interests of justice and judicial economy to review the Bankruptcy Court's holding.   This is the second time Fannie Mae has raised this specific issue on appeal in this case.   In the first appeal, the Court concluded that the Bankruptcy Court had not directly addressed the argument and remanded to give the Bankruptcy Court the first opportunity to rule on the question.   Therefore, the Court finds good cause to reach the issue now, as it seems more likely than not that Village Green will seek the same or similar contractual modifications in subsequent

---

[23] *In re Mitan*, 573 F.3d at 241.

[24] *Village Green I*, 483 B.R. at 816–17.

14

proceedings.

The Code allows confirmation of a plan over the objection of a class of secured claims so long as the plan is "fair and equitable" to the claims pursuant to 11 U.S.C. § 1129(b)(2)(A).[25] Section 1129(b)(2)(A) establishes the standard for fair and equitable treatment and sets forth three separate legal tests by which a plan can satisfy the standard.  The Sixth Circuit has described this section as the codification of the "'absolute priority rule,' which provides that absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest."[26]  Additionally, courts have held that "a plan must be fair and equitable in a broad sense, as well as in the particular manner specified in 11 U.S.C. § 1129(b)(2)."[27]  Put another way, the requirements under section 1129(b)(2)(A) are not "the sole test for a determination that a plan of reorganization is fair and equitable."[28]  The Court's task is to determine whether "the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances" is fair and equitable.[29]  In the case at bar, the Bankruptcy Court held that the plan was fair and equitable in that it satisfied the requirements of section 1129(b)(2)(A) and did not violate the absolute priority rule.  Fannie Mae has not challenged this

---

[25] 11 U.S.C. § 1129(b)(1) & (2).

[26] *In re Dow Corning Corp.*, 456 F.3d 668, 672 (6th Cir. 2006) (citing *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 115 (1939)).

[27] *E.g. In re Bryson Properties, XVIII*, 961 F.2d 496, 505 (4th Cir. 1992); *In re Dow Corning Corp.*, 244 B.R. 678, 694-95 (Bkrtcy.E.D.Mich.,1999) ("The prevailing and better view is that the phrase 'fair and equitable' is as broad as it sounds.") (collecting cases).

[28] *In re Griswold Bldg., LLC*, 420 B.R. 666, 705 (Bkrtcy. E.D. Mich. 2009).

[29] *Fed Sav. & Loan Ins. Corp. v. D & F Construction, Inc. (In re D & F Construction, Inc.)*, 865 F. 2d 673, 675 (5th Cir. 1989).

holding in either appeal.

Instead Fannie Mae maintains that the modifications to the loan agreements between the parties have improperly shifted the risk of reorganization to Fannie Mae.  Specifically, according to Fannie Mae, the reformed property management agreement permits Village Green's principals to "to operate and maintain the Property at such standards as they, in their sole discretion, may choose."[30]  Village Green is no longer required to keep the property in "good repair," and Fannie Mae no longer has the right to insist on repairs.  Likewise, Fannie Mae has lost its right to approve the property manager and the property management contract.  Under Fannie Mae's construction of the new property management agreement, Village Green and its affiliates may modify the agreement at any time without approval from Fannie Mae or Bankruptcy Court.  The reformed agreement also allows Village Green to "independently escrow" funds earmarked for taxes, insurance, and improvements, in lieu of making payments to Fannie Mae.  Village Green also has latitude in deciding how much and what kind of insurance coverage to provide for the property.  Fannies Mae objects that these modifications have impermissibly shifted the risk of Village Green's reorganization to Fannie Mae.

The Bankruptcy Court concluded that Village Green's proposed changes to the parties' contractual rights and duties was fair and equitable.  The Bankruptcy Court noted that Village Green was clearly "trying to distance itself from unrelenting accountability to Fannie Mae."[31]  The Bankruptcy Court found that the proposed changes to the parties' agreements would grant Village Green "greater autonomy" and therefore more efficiency "operating the property without unnecessary

---

[30] Fannie Mae's Opening Br. 26.

[31] Suppl. Findings of Fact & Conclusions of Law 5 (D.E. # 1-2).

interference from Fannie Mae."[32]   Village Green's increased autonomy in turn increased the likelihood of Village Green's successful reorganization and ability to pay Fannie Mae.  Fannie Mae argues on appeal that the Bankruptcy Court's analysis was too cursory and focused on the benefits of the modifications to Village Green instead of the fairness and equity of the modifications to Fannie Mae.

Before reaching the merits of Fannie Mae's arguments, the Court must clarify the appropriate standard of review for the Bankruptcy Court's assessment of the fairness and equity of Village Green's plan.  As an initial matter, both parties have correctly argued that the Court should review the Bankruptcy Court's conclusions of law *de novo*.  However, the Bankruptcy Court's conclusion that Village Green's plan was fair and equitable is an equitable determination of a kind which is generally reviewed for abuse of discretion.[33]  The Sixth Circuit has defined an abuse of discretion as a "definite and firm conviction that the [court below] committed a clear error of judgment."[34]  In other words, "[t]he question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion."[35]  "An abuse of discretion occurs when the bankruptcy court relies upon clearly erroneous findings of fact, improperly applies the law, or

---

[32] *Id.* at 6.

[33] *In re A.P. Liquidating Co.*, 421 F. App'x 583, 588 (6th Cir. 2011) ("Equitable determinations made by bankruptcy courts are reviewed for an abuse of discretion.").

[34] *In re Eagle-Picher Indus., Inc.*, 285 F.3d 522, 529 (6th Cir. 2002).

[35] *Id.*

uses an erroneous legal standard."[36]

The issue  presented then is whether the Bankruptcy Court's equitable determination about the modifications of the parties' agreements was an abuse of discretion.  It is well-established that bankruptcy courts have broad equitable powers to approve plans of reorganization.[37]  Bankruptcy courts may exercise their discretion to approve a reorganization plan that "include[s] any . . . appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[38]  Specifically, under 11 U.S.C. § 1123(b)(5), "a plan may . . . modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims."[39]  At the same time, "[d]espite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have 'free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness.'"[40] The Bankruptcy Court's broad power in equity is "limited by the role of the bankruptcy court, which is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted."[41]

The Court holds that the Bankruptcy Court abused its discretion by finding that all of Village

---

[36] *In re Fashion Shop of Kentucky, Inc.*, 350 F. App'x 24, 27 (6th Cir. 2009).

[37] *United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990) (citing *Pepper v. Litton*, 308 U.S. 295, 303, 304 (1939); *United States National Bank v. Chase National Bank*, 331 U.S. 28, 36 (1947); *Katchen v. Landy*, 382 U.S. 323, 327 (1966)).

[38] *In re Dow Corning Corp.*, 456 F.3d 668, 677 (6th Cir. 2006).

[39] 11 U.S.C. § 1123(b)(5).

[40] *In re Dow Corning Corp.*, 456 F.3d at 679.

[41] *Id.* at 677–78 (quoting *In re Chicago*, 791 F.2d 524, 528 (7th Cir. 1986)).

Green's proposed modifications to Fannie Mae's contractual rights were fair and equitable. Village Green persuasively argues that the modifications approved in the plan fall into two categories: (1) transfer of control of funds for taxes, insurance, and capital expenditures; and (2) the removal of Fannie Mae's right to consent to the management of the property. Although the plan modified contractual rights of two distinct types, the Bankruptcy Court addressed only the equities of giving Village Green greater control over escrowed funds for property taxes, property insurance, and improvements and repairs. The Bankruptcy Court found that Fannie Mae had withheld escrowed funds from Village Green and "arbitrarily accounted for the funds" in the past, a determination which would support the Bankruptcy Court's modification of Fannie Mae's contractual right to control the escrowed funds. However, the Bankruptcy Court did not address the modification of Fannie Mae's other contractual rights to consent to the management of the property. The Bankruptcy Court did not specifically make an equitable determination about those modifications or even findings to support such a determination. The Bankruptcy Court only referred to Village Green's "greater autonomy" under the plan, which would free it "to be more efficient in operating the property without interference from Fannie Mae."[42] The Bankruptcy Court never made any findings to establish how Fannie Mae had perhaps interfered in management decisions at the property in the past or how the plan's modifications to the parties' contracts would prevent such interference in the future. To the extent that the Bankruptcy Court concluded that the plan was fair and equitable without addressing the modification of Fannie Mae's right to consent to certain aspects of property management, the Bankruptcy Court abused its discretion. Therefore, the Bankruptcy Court's order is **REVERSED** on this issue.

---

[42] Suppl. Findings of Fact & Conclusions of Law 6 (D.E. # 1-2).

With respect to the plan's transfer of control over the escrowed funds, the Court holds that the Bankruptcy Court did not abuse its discretion in modifying the rights of the parties. Village Green has shown the plan made the following provision for the funds escrowed for the payment of property taxes, insurance, and capital improvements:

> Debtor will independently escrow funds allocated for the property's taxes, insurance and capital expenditures previously impounded and escrowed by Fannie Mae. Debtor will use the escrowed funds solely for payment of property taxes and insurance when these expenses become due and payable. Debtor will use the escrowed funds allocated for capital expenditures at such time as Debtor or its management determines that the funds are necessary and appropriate for repair or improvement to the property. Debtor will provide Fannie Mae with an accounting and operating report on a quarterly basis.[43]

Fannie Mae objects only to Village Green's right under the plan to "independently escrow funds" and argues that it has no assurance Village Green will actually fund the escrows or use the funds for their intended purpose. The Court finds this argument to be without merit in light of the plan's other requirements that Village Green "use the escrowed funds solely for payment for property taxes and insurance when these expenses become due and payable." Village Green is also required to provide Fannie Mae with quarterly accounting and operating reports. Nothing in these terms of the plan would reasonably suggest that Village Green will not actually fund the escrows or apply the funds as required. The Court expresses its doubts about the meaning of the ambiguous phrase "independently escrow." It is not clear whether this means Village Green is required to deposit the funds with an independent escrow agent such as a financial institution or whether Village Green has discretion over the funds and simply holds them itself until they are due and payable. The Court has some misgivings about the fairness and equity of the latter scenario. To the extent that Village Green continues to propose the term "independently escrow" as part of its plan in further proceedings, the

---

[43] Village Green's Br. 29.

Bankruptcy Court should resolve this ambiguity.   Otherwise, the Court finds no abuse of discretion in the Bankruptcy Court's equitable determination of the escrowed funds issue.   Therefore, the Bankruptcy Court's order is **AFFIRMED** on this point.

Therefore, the decision of the Bankruptcy Court is **AFFIRMED IN PART** and **REVERSED AND REMANDED IN PART** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: January 27, 2014.

21